CR-15-00924-PHX-GMS-2, September 20, 2016

1              **UNITED STATES DISTRICT COURT**

2             **FOR THE DISTRICT OF ARIZONA**

3

**United States of America**,          )
4                                        )
                        Plaintiff,       )
5     vs.                                )
                                         )   CR-15-00924-PHX-GMS-2
6     **Robert Kenneth Deatherage**,     )
                                         )
7                       Defendant.       )
                                         )   September 20, 2016
8                                        )   Phoenix, Arizona
_____   )
9

10       **BEFORE:  THE HONORABLE DAVID K. DUNCAN, MAGISTRATE JUDGE**

11       <u>**REPORTER'S 2nd AMENDED TRANSCRIPT OF PROCEEDINGS**</u>

12          PLEA HEARING (Amended to correct case number)

13                   A P P E A R A N C E S

14    For the Government:
              **LISA JENNIS , ESQ.**
15            U.S. Attorney's Office
              40 North Central Avenue, Ste. 1200
16            Phoenix, AZ  85004-4408
              602.514.7500
17
      For the Defendant:
18            **TIMOTHY D. ROGERS, ESQ.**
              Rogers Legal Group, P.L.C.
19            P.O. Box 182
              Queen Creek, AZ  85142
20            480.414.3470/(fax) 480.398.8417

21    Transcriptionist:
      **Elaine Cropper, RDR, CRR, CCP**
22    Sandra Day O'Connor U.S. Courthouse, Suite 312
      401 West Washington Street, SPC 35
23    Phoenix, Arizona  85003-2151
      (602) 322-7245/(fax) 602.322.7253
24
      Proceedings Recorded by Electronic Sound Recording
25    Transcript Produced by Transcriptionist

                  United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1                    **P R O C E E D I N G S**

2              (Court was called to order by the courtroom deputy.)

3              THE COURT:  Thank you.  Please be seated.

4         And I'm sorry for keep you can waiting.  I heard that

5    you all were actually ready earlier.  Unfortunately, I stepped

6    away to go to the Clerk's Office on the first floor and that I

7    wasn't able to be responsive to your invitation but worse than

8    that, now I'm a few minutes late.  So sorry about that.

9              COURTROOM DEPUTY:  Criminal case number 15-924,

10   *United States of America v. Robert Deatherage*, on for

11   change-of-plea hearing.

12             MS. JENNIS:  Good afternoon, Your Honor.  Lisa Jennis

13   for the United States.

14             THE COURT:  Thank you.  Good afternoon.

15             MR. ROGERS:  And good afternoon, Your Honor.  Tim

16   Rogers here on behalf of Robert Deatherage, who is present, in

17   custody.

18             THE COURT:  Thank you.

19        Good afternoon, Mr. Deatherage.  How are you?

20             THE DEFENDANT:  Good.  How are you?

21             THE COURT:  I'm fine.  Thank you.

22        I have been told that it's your wish to plead guilty

23   pursuant to a plea agreement.  Is that correct?

24             THE DEFENDANT:  I'll accept it, yes.

25             THE COURT:  Okay.  Well, this is a decision that

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

```
 1   requires you in the first instance not only to read the plea
 2   agreement and think about it but also to come into court and
 3   have a conversation with a judge about things that are
 4   mentioned in the plea agreement but things the Court has a
 5   responsibility to make sure have been addressed in your mind
 6   and that is the following:  You have the right to remain silent
 7   and never say anything at all and require the Government to
 8   prove that you did commit a violation of law.  But if you want,
 9   you can do the opposite of silence.  You can, by your own
10   words, create the basis for a guilty conviction against you.
11   But you can only do that if the decision is determined to be
12   knowingly, voluntarily, and intelligently made.  And the word
13   "knowingly" here encompasses a broad range of things but in
14   particular here, what it means is that you know what rights you
15   have that you're giving up.
16          So since I can't jump into your head and see what you
17   can, the only way I can know for sure is to explain the rights
18   to you, make a record of it in court and then ask you do you
19   understand all of these rights that you would be giving up and
20   then ask you at the end is it your wish to voluntarily give
21   them up.
22          THE DEFENDANT:  Right.
23          THE COURT:  Do you understand everything that I've
24   said so far?
25          THE DEFENDANT:  Yes.  Yes, I do, Your Honor.
```

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

```
 1            THE COURT:  If I ever say saying something you don't

 2   understand, it is important that you let me know so that I can

 3   have an opportunity to go over it again.

 4            THE DEFENDANT:  Absolutely.

 5            THE COURT:  Also --

 6            THE DEFENDANT:  Thank you.

 7            THE COURT:  -- if at any time you want to talk to

 8   your attorney, you should feel free to interrupt me.  You can

 9   then step back from the microphone and have a private

10   conversation with your lawyer as long as you need.

11            In addition, in order to plead guilty, you would have

12   to take an oath in which you would swear or affirm to tell me

13   the truth.  If it is later shown that you didn't tell the

14   truth, you could be charged with the additional crimes of

15   perjury or making a false statement.  And both of those crimes

16   carry the potential for additional prison time.

17            Do you understand that?

18            THE DEFENDANT:  Yes.  Yes, I do.

19            THE COURT:  Then please raise your right hand as best

20   you can and the Clerk of the Court will administer the oath.

21            (Whereupon the defendant was sworn.)

22            COURTROOM DEPUTY:  Thank you.

23            THE COURT:  What is your true name, please.

24            THE DEFENDANT:  Robert Kenneth Deatherage.

25            THE COURT:  How old are you?
```

United States District Court

1        THE DEFENDANT:  52 in March.

2        THE COURT:  How far did you go in school?

3        THE DEFENDANT:  12th.

4        THE COURT:  The signature page of your plea agreement

5  that I hold up in front of you has your signature on it in

6  black ink.

7        Is that your signature?

8        THE DEFENDANT:  That is.  It is.

9        THE COURT:  Did you read the plea agreement before

10  you signed it?

11        THE DEFENDANT:  I did.

12        THE COURT:  Did you understand everything that was in

13  it?

14        THE DEFENDANT:  Not everything.

15        THE COURT:  On the things that you didn't understand,

16  did you have enough time to talk to your lawyer to ask

17  questions about those things?

18        THE DEFENDANT:  I did.  I did.

19        THE COURT:  So at the end of the day, do you think

20  that you do understand everything that is in your plea

21  agreement?

22        THE DEFENDANT:  I have pretty vague understanding.

23        THE COURT:  Okay.  Well, we'll address some of the

24  things that are addressed in the plea agreement.  And before I

25  ask you at the end how you want to plead, I'm going to revisit

CR-15-00924-PHX-GMS-2, September 20, 2016

1    this subject and see if there's anything that still is a little

2    bit hazy in your mind about what's in the plea agreement, okay?

3                THE DEFENDANT:  Okay.

4                THE COURT:  All right.  Were you able to communicate

5    well with your lawyer?

6                THE DEFENDANT:  Yes.  Absolutely.

7                THE COURT:  Have you been satisfied with the

8    representation he's provided to you so far?

9                THE DEFENDANT:  With Mr. Tim Rogers, yes, I am.

10               THE COURT:  Have you had, in the last 48 hours, any

11   alcohol or any drugs of any kind, including prescription drug

12   medication?

13               THE DEFENDANT:  Yes.  Yes, I have.

14               THE COURT:  Do you feel comfortable telling me in

15   open court what you've had?

16               THE DEFENDANT:  What they are giving me?

17               THE COURT:  Yes.

18               THE DEFENDANT:  No problem.  They are giving me

19   antidepressant medication.

20               THE COURT:  Okay.

21               THE DEFENDANT:  Citalopram hydrobromide and

22   hydroxyzine.

23               THE COURT:  But there's an antidepressant.  Is that

24   the only thing you're taking?

25               THE DEFENDANT:  Well, I've been -- I was put into

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1  protective custody, segregation.  Due to my former work, most

2  of the people in the pod I was in I actually helped put in

3  there and they saw me on television, due to the media spin, and

4  then the case manager took me out of there and put me in -- and

5  I have been in segregation ever since.

6           THE COURT:  Okay.  And is that the reason that you're

7  on the antidepressant medication?

8           THE DEFENDANT:  Yes.  I get no recreation time, so

9  I'm locked in there 24/7 except to go use the shower.

10          THE COURT:  Okay.  Got it.

11          THE DEFENDANT:  That's like 14 months now.

12          THE COURT:  Okay.  Well, here is the reason that I'm

13 asking this question:  It's important that today, on the 19th

14 of September at 3:10 p.m., that you have a clear mind --

15          THE DEFENDANT:  I do.  Absolutely.

16          THE COURT:  -- that you understand everything that's

17 going on in Court.  And sometimes medication, or the reason a

18 person takes medication, the reason you just described, could

19 interfere with a person's ability to think.  And I need to know

20 whether you feel that right now you are able to understand

21 what's going on in Court.

22          THE DEFENDANT:  Yes, absolutely.

23          THE COURT:  Do you think you have a clear mind now?

24          THE DEFENDANT:  I do.

25          THE COURT:  And do you think there's anything

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    interfering with your ability to think right now?

2              THE DEFENDANT:  No.  The room is a little big but

3    that's --

4              THE COURT:  Well, you kind have become habituated to

5    a smaller room.  This is just a transitional space.  When you

6    get in the district judge's courtroom, it will be bigger even

7    still.  But by then, you'll be used to this one so it will be

8    okay.  But, again, the seriousness of it -- and I appreciate

9    you're able to look at the circumstances of a difficult

10   situation with still some kind of -- it's not levity but at

11   least not just sort of giving it all up.  I mean, obviously,

12   our lives hold travail.  Different people have different

13   travails at different times.

14             THE DEFENDANT:  Right.

15             THE COURT:  Fundamentally, all of what I'm talking to

16   you now boils down to a concept and that is, is it fair to hold

17   you to the decision that you would make today knowing what you

18   know about the state of your mind and your thinking process?

19             THE DEFENDANT:  Yes.  I would say so, yeah.  I do

20   have a couple of questions about the plea agreement, though.  I

21   do, just a couple.

22             THE COURT:  Well, are those questions for your

23   lawyer?

24             THE DEFENDANT:  Well, I've discussed it with him.

25             THE COURT:  Okay.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1          THE DEFENDANT:  Just a couple of the things it says.

2          THE COURT:  I'll tell you what.  As I said, let me go

3   through -- some of what I'm going to cover may address what

4   your questions are.  But if they don't, at the end, I'm going

5   to ask you, "Do you still have any questions?"

6          THE DEFENDANT:  Sure.  Sure.

7          THE COURT:  And we'll take those up, but it might be

8   some -- sometimes, at least in my experience, the total

9   conversation that we have, it seems to sometimes all fit

10  together for the defendant in a way to help them understand

11  what the different components are individually as well as the

12  grand picture that they make up.

13         One of the things I do need to address with you is

14  the fact that the charge that you would be pleading guilty to

15  is set forth in an information.  An information is a document

16  that the prosecutor prepares.  It sets forth your name as the

17  defendant and then it describes the charge that you would be

18  pleading guilty to.

19         This information can be used as the charging document

20  in your case only if you say it's okay with you.  The reason

21  your permission is required is that you have the right to have

22  a more formal process produce the charging document.  That more

23  formal process is called a grand jury indictment.

24         THE DEFENDANT:  Okay.

25         THE COURT:  The grand jury is a group of 16 to 23

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1 people.  They are summoned here to the courthouse.  The

2 Government then presents evidence to them.  If 12 or more grand

3 jurors decide that a person has committed a crime based upon

4 the Government's showing that there's probable cause to believe

5 that's true, they so vote and the result of that vote is called

6 a grand jury indictment and it's recorded on a piece of paper

7 and it's that piece of paper which becomes the charging

8 document in the case.

9        Did you understand the grand jury process I just

10 explained?

11             THE DEFENDANT:  No.  John Rock never showed me that.

12             THE COURT:  Okay.  All right.

13             THE DEFENDANT:  He was my previous attorney.

14             THE COURT:  Here's the thing.  It's important before

15 you decide to give up your right to a grand jury indictment

16 that somebody like me explains to you what it is.  But that

17 doesn't mean that it's something that he did wrong by not

18 telling you.  That is because, honestly, most of the time when

19 people decide to give up their right to a grand jury

20 indictment, they are doing it because it's actually in their

21 best interest.  But the Constitution contains this requirement

22 and so in order to make sure that somebody's knowingly giving

23 up their right, I need to address it.

24        But it oftentimes is not an issue in terms of whether

25 it adversely affects the rights of a person who has decided

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1   they are going to plead guilty.

 2           THE DEFENDANT:  Right.

 3           THE COURT:  If you don't want to plead guilty, then

 4   it becomes a more significant issue.  Maybe members of the

 5   community should be evaluating it.  But if you in your own mind

 6   have decided, "I'm going to plead guilty," you still need to

 7   have a charging document.

 8           THE DEFENDANT:  Right.

 9           THE COURT:  And the information serves that purpose.

10   But if you're deciding in your own head to plead guilty, you

11   probably don't need 12 people from the community deciding that

12   there's probable cause.  You people already made that decision

13   that not only is there probable cause that if I go to trial,

14   I'm likely -- maybe to be convicted and you maybe have made

15   that decision in your own head and you don't need 12 people to

16   tell you there's probable cause because probable cause is down

17   hear and beyond a reasonable doubt is up here.  Do you get what

18   I'm saying?

19           THE DEFENDANT:  Exactly.  I know exactly what you're

20   saying.

21           THE COURT:  Okay.  I gather you do understand what I

22   mean by grand jury indictment?

23           THE DEFENDANT:  I do.

24           THE COURT:  And is it your wish to give up your right

25   to a grand jury indictment and to, instead, plead guilty to the

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    charge in the information?

2            THE DEFENDANT:  Yeah.  I think it would be in my best

3    interest.  I do.  I do.

4            THE COURT:  Well, the information alleges that you

5    violated Title 18 of the United States Code, Section

6    924(c)(1)(A)(i) and this is the Class A felony offense of

7    possession of a firearm in furtherance of a drug-trafficking

8    offense.

9            Do you understand what the charge is that you would

10   be pleading guilty to?

11           THE DEFENDANT:  I do.  Okay.  It being that he had a

12   firearm or myself?  Is that what --

13           THE COURT:  Well, it's a crime -- here's what maybe

14   answers this question for you.  If you decided to have a trial

15   on this charge, what the jury would be required to find beyond

16   a reasonable doubt are each of the following elements.

17           THE DEFENDANT:  Okay.

18           THE COURT:  First, that on or about July 22, 2015, in

19   the District of Arizona, you knowingly possessed a firearm and,

20   second, at the time you possessed the firearm, you knowingly

21   carried it in relation to, or possessed it is furtherance of, a

22   drug-trafficking offense, a felony prosecutable by a court of

23   the United States.

24           Did you understand these elements that I just shared

25   with you?

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    THE DEFENDANT:  Yes, I do.

2    THE COURT:  So those are the things the Government

3  would have to prove at a trial in order to obtain a conviction

4  against you.  So those elements actually tell you what the

5  crime is.  They would have to prove, the Government would have

6  to prove these two things beyond a reasonable doubt, that you

7  possessed a firearm, you did, and that you possessed it,

8  knowingly carried it in relation to, or possessed in relation

9  to furtherance of a drug-trafficking offense.

10    Do you understand that?

11    THE DEFENDANT:  Yes, I do.

12    MR. ROGERS:  Your Honor, if I may interrupt.  The

13  theory that the charge is based on that the Government believes

14  they would be able to prove would be under a Pinkerton theory,

15  that it wasn't him that possessed the firearm but that it was a

16  co-defendant.

17    THE COURT:  Okay.

18    THE DEFENDANT:  Right.

19    THE COURT:  So one of the things that you have to

20  consider is the choice that you have between remaining silent

21  and never saying anything at all and having a trial and what

22  the possible outcome could be at that trial and, on the other

23  hand, deciding to plead guilty.  It sounds like you've had

24  conversations with your lawyer.

25    THE DEFENDANT:  Yes.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1          THE COURT:  I just want to address questions that you

2  raise about what it is that the Government would have to prove

3  at a trial.  And there is a doctrine of law that provides --

4  it's under a case called Pinkerton that is something that you

5  do need to address as somebody who is facing this charge and it

6  sounds like you've -- when I say "address it," it's something

7  you have to think about and decide what are the outcomes here.

8          THE DEFENDANT:  Right.

9          THE COURT:  And it sounds like you've had the

10  opportunity to do that.

11          THE DEFENDANT:  Yes, I have.

12          THE COURT:  So do you feel that you do understand

13  what the charge is that you would be pleading guilty to?

14          THE DEFENDANT:  Yes.  Yes, Your Honor.

15          THE COURT:  A violation of this statute is punishable

16  by the following maximum penalties.  The rules of Court require

17  that I tell you what the maximum penalties are.  A fine of

18  $250,000, a maximum term of imprisonment of life, or both the

19  fine and imprisonment, and a term of supervised release of five

20  years.

21          In addition, there is a mandatory minimum sentence of

22  five years and any term of imprisonment imposed under Section

23  924(c) must run consecutively to any other term of imprisonment

24  ordered against the defendant.  In addition, at the time of

25  sentencing, the Court would order you to pay restitution to any

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    victim of the offense and order you to pay a special assessment

2    of $100.

3            The rules of the Court also require that I tell you

4    what supervised release means.  Supervised release is a period

5    of time that starts after you have finished serving any prison

6    sentence.  During this time of supervised release, the Court

7    sets conditions which are things that you have to do or things

8    that you are not allowed to do during the time of supervised

9    release.  If you violate any of those conditions, you could be

10   subjected to additional prison time in today's case.

11           THE DEFENDANT:  Probation in other words?

12           THE COURT:  Well, it used to be called probation in

13   the federal system but then we changed the use of the words.

14   We decided that probation would only apply for somebody who was

15   sentenced to a term of supervision without a prison sentence,

16   but we decided that if somebody started with a prison sentence,

17   then we would call it supervised release.

18           THE DEFENDANT:  I see.

19           THE COURT:  But essentially you're right.  It's still

20   supervision.  It's kind of like probation.  And then did you

21   also understand the statutory and maximum penalties that I

22   explained?

23           THE DEFENDANT:  Yes, I do.

24           THE COURT:  This conversation that we are having now

25   is a conversation that you do have the right to have with the

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1   district judge assigned to your case.  That judge is Judge

2   Murray Snow.  As a district judge, he's a higher judge than I.

3   He was appointed by President Bush and will have the

4   opportunity to serve for his life whereas a magistrate judge,

5   the kind of judge I am, is appointed by the district judges

6   here in Arizona and I serve a renewable term of only eight

7   years.  You have the right to have a life-tenured judge conduct

8   this conversation that we're engaged in now.  But if you wish,

9   you can give up that right and have me conduct it and have me

10  make a recommendation to Judge Snow as to whether a plea of

11  guilty should be accepted.

12          Is that how you would like to proceed?

13          THE DEFENDANT:  Yeah.  Proceed, definitely.

14          THE COURT:  Judge Snow will have the opportunity to

15  review the plea agreement and to decide for himself whether to

16  accept it or reject it.  If he rejects it, you could then

17  withdraw from it and enter a plea of not guilty and nothing you

18  said here today could be used against you.  On the other hand,

19  if Judge Snow accepts your guilty plea, you won't be able to

20  change your mind after that unless you can show a fair and just

21  reason to do so.

22          Do you understand that?

23          THE DEFENDANT:  Yes, I do, Your Honor.

24          THE COURT:  The decision to plead guilty must be

25  voluntary.  This means it that would be wrong for anyone to

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    force you to plead guilty, to make threats against you to try

2    to get you to plead guilty or to make any unwritten promises to

3    you.

4              Has anybody done any of those things?

5              THE DEFENDANT:  Yes.

6              THE COURT:  They have used threats or force against

7    you?

8              THE DEFENDANT:  Well, in a way.

9              THE COURT:  Who?  You mean the Government?

10             THE DEFENDANT:  Yes.

11             THE COURT:  By saying to you, if you proceed to trial

12   and if the jury returns a guilty verdict against you, you could

13   face a lot more prison time.  Is that what you mean?

14             THE DEFENDANT:  I mean a friend to be held to testify

15   against me or something that didn't happen so he could get a

16   lesser sentence.

17             THE COURT:  Well --

18             THE DEFENDANT:  That's pretty clear.

19             THE COURT:  Well, here's the thing.  At the end of

20   the day, it's actually not possible for anybody really to force

21   you to plead guilty or to make threats against you that result

22   in a guilty plea that you don't want to enter because you ought

23   to be -- and you've shown you've resisted a lot of

24   contrariness.  I mean, you're telling me that you're in

25   protective segregation now.  So the fact that people made

CR-15-00924-PHX-GMS-2, September 20, 2016

 1    threats against you, you know how to do what you want to do.

 2              THE DEFENDANT:  I get death threats daily, Your

 3    Honor.

 4              THE COURT:  Pardon me?

 5              THE DEFENDANT:  I get death threats daily, Your

 6    Honor, against my family as well.

 7              THE COURT:  So here's the thing.  You shouldn't plead

 8    guilty if you don't want to.  But if you decide, looking at the

 9    total spectrum of what is all out there that you face, it's

10    your decision.  "Do I do it or not do it?"  And so you

11    shouldn't allow somebody else to control that decision.  You

12    should have the freedom as person to decide what's best for

13    you.  But this is a pretty sophisticated person I'm talking to.

14    I mean, you have been around the block and so it's not as if

15    I'm talking to somebody who thinks, "Oh, I was in a room and

16    they said, 'You better plead guilty.'"  I don't think you're

17    that kind of person.

18              THE DEFENDANT:  No.  Nobody --

19              THE COURT:  You decide for yourself.  And that's

20    really what this inquiry is about.  Did you -- were you a

21    strong enough person so that when you decide to answer the

22    question that I ask you at the end, if you say the words,

23    "Guilty," that is a decision that you're making because you've

24    looked at all of the situation and you've decided, "That's what

25    I have decided I want to do"?

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1          THE DEFENDANT:  Yes.  Honestly, if I may say

 2  something.

 3          THE COURT:  Sure.

 4          THE DEFENDANT:  My face has been slandered to the

 5  media internationally and nobody is going to see me as the good

 6  guy, you know what I mean.  I have been serving my community in

 7  Arizona for ten years.  I love Arizona.  I love the people of

 8  Arizona.  But they have portrayed me as, like, the bogeyman.

 9  And I really see no other alternative to do -- you know, I

10  don't want to do a maximum sentence.  Nobody is going -- 12

11  people are just going to -- I just can't do it.

12          THE COURT:  Well, you know, I'm one of those

13  judges -- there are judges that have different views about

14  this.  Some judges think that you ought to allow people who

15  have done what you've done and then have looked at the

16  circumstances and have decided, "I have a choice.  I can go

17  forward with the trial.  I don't like what I think could happen

18  at that trial, knowing all that I know."  None of us can change

19  the world.  Facts are sometimes the way they are.

20          So some things we can change but some things we

21  can't.  And on those things that you yourself think that maybe

22  couldn't change, then maybe it's okay for a judge to say to

23  you, "I'm going to let you make that decision.  I'm going to

24  let you be the grown-up and decide what you think is best for

25  you, knowing all that you know."  But you can only do that if

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    I've told you the opportunity that you have to tell 12 people

2    from the District of Arizona anything you want to tell them or

3    to remain silent and never say anything at all.

4           I mean, if you decided to have a trial, you would

5    have, if you wanted, to an opportunity to present a defense to

6    them.  You could try to counter any of the things that you

7    said.  We would find a fair and impartial jury for you.  We

8    would -- and your lawyer would be able to suggest questions to

9    Judge Snow for the voir dire of the jury, the examination of

10   the members of the jury to make sure that they came into the

11   courtroom without any bias against you or the crime that you

12   were charged with.  So we would select 12 people who were

13   qualified to be fair jurors in your case.

14          And then at the trial, the Government would present

15   its case and during this time, you would have the opportunity

16   to cross-examine through your lawyer any witness for the

17   Government, anybody who was going to testify against you would

18   have to be present in the courtroom so that your lawyer could

19   ask that person questions on cross-examination.

20          THE DEFENDANT:  Right.

21          THE COURT:  Now, when the Government finished

22   presenting its case, you would have the right to do nothing,

23   remain silent.  But if you wanted to, you could present a

24   defense to the jury.  You could use the Court's subpoena power

25   to call witnesses in to Court to testify in your defense.  You

CR-15-00924-PHX-GMS-2, September 20, 2016

1   could even testify yourself if you wanted to.  But you wouldn't

2   have to because you do have the right to remain silent.  And if

3   you chose to exercise that right, Judge Snow would tell the

4   jury that they couldn't hold your silence against you.  You

5   could only be convicted if the 12 members of the jury

6   unanimously decided that you were guilty beyond a reasonable

7   doubt of each one of the elements of the charged offense.

8          Do you understand all of those rights that you would

9   have at a trial?

10         THE DEFENDANT:  I do, Your Honor.  I guess, what I

11  fear the most is the bias opinion of others because it's

12  just -- that's the way it is in that line of work.

13         I do take responsibility.  I mean, I don't -- I was

14  there.  I was here at this place with these two people.  I

15  don't deny that.  Whether there were four is another thing.

16  This Carlos guy that is in this agreement, I don't know him.

17  I've never talked to him.  I've never seen him.  I don't know

18  him.  So that's the guy -- that's one thing in there that

19  just -- I don't know who he is.  This is something Mr. Parris

20  Frazier was dealing with himself on his own.

21         But like I said, I take responsibility for being

22  there and for a lesser charge, I am willing to plead guilty.  I

23  mean, I do take responsibility for being there.  I was at the

24  wrong place at the wrong time.  I don't deny that.

25         THE COURT:  Well, Carlos in the factual basis is in

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1  quotes.  I don't know the purpose of that.  But what it does

2  say -- let's just work through this.  Go to page nine and I'm

3  going to talk to you about it.  It says in the first sentence,

4  "On an unknown date in July 2015, I agreed with Paris Frazier

5  and Erik Foster to commit a drug trafficking crime by either

6  stealing drugs or proceeds from drug trafficking from a vehicle

7  in Arizona with the intent of either selling the drugs to

8  another person named 'Carlos' or splitting the drug proceeds

9  among the three of us."

10          Is there anything in that sentence that is not true?

11          THE DEFENDANT:  Splitting the drug proceeds and the

12  guy named Carlos.  Yeah.  I was not there to get drugs, Your

13  Honor.  But --

14          THE COURT:  Well, let's back up from that.  It said

15  that you agreed with Paris Frazier and Erik Foster to commit a

16  drug-trafficking crime.  Is that true or not?

17          THE DEFENDANT:  Well, I guess proceeds from a drug

18  crime, I guess maybe.  I guess you would call it.

19          THE COURT:  So you agreed to participate to the

20  extent that you would receive proceeds from the

21  drug-trafficking crime?

22          THE DEFENDANT:  Right.  I guess.  I guess that would

23  be it.

24          THE COURT:  So that's true?

25          THE DEFENDANT:  Yes.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1      THE COURT:  And then you're telling me that -- did

2  you know that the way that this crime would be handled was

3  either by stealing drugs or proceeds from drug-trafficking from

4  a vehicle in Arizona?

5      THE DEFENDANT:  Only cash is what was supposed to be

6  in this vehicle, not --

7      THE COURT:  But you were aware it was

8  drug-trafficking proceeds and you knew the group of -- the

9  three of you were agreeing that these cash proceeds would be

10  taken from the vehicle?

11      THE DEFENDANT:  Correct.

12      THE COURT:  And you knew that the cash was the

13  proceeds from drug-trafficking?

14      THE DEFENDANT:  Correct.  Correct.  There was not

15  supposed to be any drugs in the vehicle?

16      THE COURT:  Okay.  And then it says, "On July 22,

17  2015, Parris Frazier, Erik Foster and I drove in a Toyota Camry

18  to a location in Phoenix, Arizona where Parris Frazier met

19  with," quote, "Carlos in a parking lot in order to find out

20  where the aforementioned vehicle was located."

21      Is that true?

22      THE DEFENDANT:  We did go to a parking lot.  I did

23  not get out of the vehicle.  Mr. Frazier had actually went

24  across the parking lot to meet with some guy who I'm guessing

25  is Carlos who was the UCE for the FBI.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1        THE COURT:  All right.

2        THE DEFENDANT:  I never spoke with him or talked to

3    him.

4        THE COURT:  And then it says, "After meeting with

5    "Carlos", Frazier returned to the Toyota Camry and the three of

6    us followed "Carlos" to a warehouse located on 39th Avenue in

7    Phoenix, Arizona where we believed the vehicle would be

8    located."

9        THE DEFENDANT:  That is correct.  Erik Foster did

10   drive and follow the vehicle.

11       THE COURT:  Okay.  And that's what the next sentence

12   says.  Its says, "Foster was driving the Camry."

13       THE DEFENDANT:  Yes.

14       THE COURT:  And you were in the Camry?

15       THE DEFENDANT:  I was in the back seat, Your Honor,

16   yes.

17       THE COURT:  And you knew where you were going?

18       THE DEFENDANT:  I did.  Yeah.

19       THE COURT:  And then it says, "Frazier exited the

20   Camry and cut the lock on the gate to the warehouse."

21       You saw that?

22       THE DEFENDANT:  M'hum.  He did.  He did.

23       THE COURT:  And, "After the lock was cut, both

24   Frazier and I entered the warehouse parking lot on foot and

25   located the vehicle containing what I later found out to be

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1     cocaine."

2               Is that true?

3               THE DEFENDANT:  I did trespass, Your Honor, and I did

4     walk alongside the warehouse building and yell back.  I went in

5     about maybe 60 feet from the vehicle, from Foster's vehicle.

6               THE COURT:  But the purpose was to find this vehicle?

7               THE DEFENDANT:  Yes.

8               THE COURT:  Okay.

9               THE DEFENDANT:  And yes, I did see the vehicle back

10    there but I did not go to it.  I never touched anything in it.

11              THE COURT:  And I gather that you have seen evidence

12    that would make you think that if you had a trial, the jury

13    would hear that this car contained cocaine?

14              THE DEFENDANT:  Absolutely.

15              THE COURT:  Okay.  And then it says, "Frazier was

16    armed with a pistol and there were other firearms in the car."

17              Is that true?

18              THE DEFENDANT:  He said he had long guns -- they

19    weren't back there with me so I did not know and I did not see

20    him brandish anything, so I cannot say exactly.

21              THE COURT:  But did you know that Frazier was armed

22    himself?

23              THE DEFENDANT:  He said he was.

24              THE COURT:  Okay.  So he told you that.  And do you

25    have any doubt that there would be evidence that the jury would

                       United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    hear that there were other firearms in the car?

2              THE DEFENDANT:  Due to their testimony, I believe

3    they would, Your Honor.

4              THE COURT:  The jury would hear that?

5              THE DEFENDANT:  Yes, they would.

6              THE COURT:  Okay.

7              And then it says, "I stood guard while Frazier

8    searched the car for packages of cocaine and found six

9    packages."

10             Is it true you stood guard?

11             THE DEFENDANT:  I went back and said to -- yelled

12   back at Foster that there is a vehicle back here and I walked

13   back to Foster's car.  Frazier is the one who went in the

14   vehicle and took what was in it and he took it back to the

15   vehicle.

16             THE COURT:  But this says you stood guard.

17             THE DEFENDANT:  I did not stand guard.  There was

18   nothing -- I didn't stand guard.

19             THE COURT:  Okay.  Do you think a jury could

20   determine, based upon hearing what happened that day, that you

21   were standing guard?

22             THE DEFENDANT:  Due to all the media pictures and my

23   gear, yes, I think they would probably think because that's

24   kind of what I do down south, helping border patrol officials.

25   Standing guard, surveillance and, you know, doing

                    United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    reconnaissance and surveillance for them, sharing intelligence
2    with them.
3            THE COURT:  It then says that, "We then returned to
4    the Camry and put the packages in a newly purchased duffle
5    (sic) bag."
6            So what role did you have in that?
7            THE DEFENDANT:  When Foster rolled away, I was in the
8    back seat like I said.  I looked up to see what Frazier was
9    doing.  He had a little gym bag and some packages in it and he
10   was squeezing them and I said, "That's not money, Dude."  I
11   said, "That's not money."
12           And Foster said, "Get that out of my car now."
13           And Parris was scared.  He was -- he was just kind of
14   incoherent.  He wasn't doing anything.  So I took the
15   initiative to reach up in the front seat and grab a bag and
16   distance myself from it as far as possible.  I shot-put the
17   thing out of the vehicle about -- I don't know -- ten yards off
18   the side of Grand Avenue into a ditch.  And I thought, you
19   know, that was it.  I've got nothing to do with this guy any
20   more and he's just -- anyways.
21           THE COURT:  The factual basis of this plea agreement
22   says this about the timing of all of that.  It says, "We were
23   soon pursued by law enforcement so we threw the duffle (sic)
24   bag containing the packages out the window..."
25           THE DEFENDANT:  I didn't see any law enforcement

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

```
 1   officials following us, Your Honor, at all.  We went back to
 2   his girlfriend's house and I sat there telling her what he just
 3   did.  She hasn't been seeing him that long.  He started kind of
 4   pacing around and was getting ready to go back to the scene.
 5            (Defendant confers with counsel.)
 6            THE DEFENDANT:  Oh, yeah.  We found out later that
 7   they were pursuing by air actually but we didn't know.
 8            THE COURT:  And then it says that you thought that
 9   the people would make you, Frazier and Foster, would make
10   approximately $50,000 each for stealing what you expected to
11   have been in the car.
12            THE DEFENDANT:  I don't know -- I have no -- there
13   was no set price told to me or anything or about exchanging
14   drugs for money.  It was all about picking just money up like
15   he had been doing.  He told me he had been taking cash loads
16   and he's taken thousands of dollars with him and one other.  So
17   I found out through all of us, a person named Brandon Berg
18   (phonetic), they had been taking multiple money drops from the
19   FBI, those load vehicles, and that's what he said he was
20   picking up.  It was just cash.
21            (Defendant confers with counsel.)
22            THE DEFENDANT:  There was no set amount of cash.  It
23   was an undisclosed amount of cash.
24            THE COURT:  Let me ask Mr. Rogers about whether
25   there's been any disclosures from the Government with respect
```

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1   to the sentence in the plea agreement that says, "I thought we
 2   would make approximately $50,000 each for stealing the
 3   packages."
 4            MR. ROGERS:  Your Honor, there's quite a bit of
 5   disclosure in the case.  I don't recall specifically where that
 6   came from.
 7            THE COURT:  Ms. Jennis, do you have any insight as to
 8   that?
 9            MS. JENNIS:  Yes, Your Honor.  The undercover
10   employee, everything was recorded.  And so both co-defendants
11   have pled and it's in their factual basis, too.
12            THE COURT:  I see.  So the co-defendants have pled
13   guilty and in the factual basis, according to the Government's
14   representation here, they have each said that there was an
15   agreement that the three of you would each get $50,000.
16            THE DEFENDANT:  He actually did.  I saw his interview
17   on tape and he actually knew there was drugs.  I heard it come
18   out of his own mouth, and he had been (inaudible) --
19            THE COURT:  But what Ms. Jennis has just said is that
20   the Government believes it would present evidence at trial in
21   which the jury would hear that the there was an agreement for
22   the three of you to each receive $50,000.
23            THE DEFENDANT:  Absolutely.  It would.
24            THE COURT:  All right.  Okay.
25            And then it says, "The firearms were removed from the

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1  Camry after we arrived at Frazier's girlfriend's house and were

2  brought inside the house where we were later arrested."  So

3  that the firearms were brought inside the house; is that true?

4  THE DEFENDANT:  That's false.  All my firearms were

5  at Michelle Henson's house, and I noticed that she's also

6  changed her statement after the FBI went after a month --

7  THE COURT:  What about the firearms that were in the

8  Camry?

9  THE DEFENDANT:  I didn't see any.

10  THE COURT:  Okay.

11  THE DEFENDANT:  I didn't see any.  There weren't any

12  in the back seat with my, and Erik Foster wasn't armed either.

13  THE COURT:  So you don't know personally whether the

14  firearms were removed from the Camry after you arrived at

15  Frazier's girlfriend's house?

16  THE DEFENDANT:  No.  I did not see him remove

17  anything out of that.

18  THE COURT:  So the other question I have to ask is

19  whether or not your lawyer and you have talked about the fact

20  about whether or not the jury would hear evidence about

21  firearms that were removed from the Camry and brought inside

22  the house.

23  THE DEFENDANT:  He said -- Parris Frazier said in his

24  interview that he did.  I didn't.  I went into the living room

25  and sat in with Michelle Henson immediately as soon as we got

United States District Court

1    there.  I was a little disturbed about what Frazier had done,

2    being what we do, you know, after ten years of trying to keep

3    this stuff out of our country.  He's turned and done the exact

4    opposite.  And I mean, I had a really good reputation, Your

5    Honor, and he's destroyed that.  He's destroyed everything I've

6    ever done.

7                MR. ROGERS:  Your Honor, if I --

8                THE COURT:  Go ahead, Mr. Rogers.

9                MR. ROGERS:  If I may.  That sentence in the factual

10   basis that Mr. Deatherage and I have talked about at length, it

11   would be testimony that would be brought out at trial through

12   Mr. Frazier's girlfriend, Michelle Henson, that her statement

13   was that the firearms were in the vehicle -- the firearms were

14   not in the house before they arrived at the house.

15               And also Mr. Frazier is the one who had said the

16   firearms were removed from the vehicle and placed in the house.

17   So we believe that -- again, Mr. Deatherage and I have

18   discussed that.  We believe that that would be the evidence

19   presented at trial.

20               THE COURT:  Okay.

21               And then the factual basis says, "Additionally, on

22   July 22, 2015, law enforcement conducted a search warrant at

23   Frazier's girlfriend's house in Phoenix where they found the 31

24   items listed in the forfeiture section of the plea agreement at

25   the residence."

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1              Is that true?

2              THE DEFENDANT:  That is true, Your Honor.  Everything

3    was stored.  They took stuff out from under the beds and gun

4    safes and, you know, we were supposed to go shooting in

5    Prescott that day, go up north.  I kind of played hooky from

6    work to go do that.  We never made it.

7              Frazier had other ideas, I guess, and he stalled

8    throughout the day and all our stuff was stored there and off

9    of Michelle's kitchen where Frazier had his loading bench, his

10   reloading bench, and all of his tools and whatnot.  That's

11   where they found everything.

12             THE COURT:  Well, the reason that I spent so much

13   time on this page nine, the paragraph ten, the factual basis,

14   is that one of my jobs is to determine whether or not there is

15   a basis-in-fact for a plea of guilty in case -- in the case, a

16   basis-in-fact that would support a belief that a jury could

17   come to the conclusion that the Government had proved each

18   element of the charged offense beyond a reasonable doubt.

19             And so I'm going to ask you, do you believe that the

20   factual evidence that we have discussed could lead a jury to

21   conclude that the Government had proved its case, meaning that

22   it had proved each element of the charged offense beyond a

23   reasonable doubt?

24             THE DEFENDANT:  I do believe that, Your Honor.

25             THE COURT:  Okay.

                    United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1          THE DEFENDANT:  I do.  That's why I -- I accept the

 2    plea.

 3          THE COURT:  Thank you.

 4          Ms. Jennis, is the Government satisfied with this

 5    factual basis?

 6          MS. JENNIS:  Yes, Your Honor.

 7          THE COURT:  Does it believe it could prove each

 8    element of the charged offense beyond a reasonable doubt?

 9          MS. JENNIS:  Yes, sir.

10          THE COURT:  And, Mr. Rogers, are you aware of any

11    reason why your client should not be permitted to plead guilty?

12          MR. ROGERS:  No, Your Honor.

13          THE COURT:  There -- there are a couple of other

14    subjects that we need to address.  We need to talk about

15    sentencing under the terms of the plea agreement.  I know

16    you're familiar with that.  But I also, as part of the rules of

17    the Court, am required to explain to you how sentencing works

18    generally, what would happen with sentencing if you decided not

19    to plead guilty pursuant to the terms of a plea agreement, and

20    so I'm going to take a moment to do that now.

21          THE DEFENDANT:  Okay.

22          THE COURT:  Sentencing in federal court works

23    pursuant to these things in this book called the sentencing

24    guidelines.  And the guidelines get applied through a table

25    that is the same one that's on the lectern right in front of

United States District Court

34

CR-15-00924-PHX-GMS-2, September 20, 2016

1   you.

2             THE DEFENDANT:  Correct.

3             THE COURT:  And the table has on its left side the 43

4   offense levels.  The book describes every offense against the

5   laws of the United States and then it links with each one of

6   those offenses an offense level.  And you'll see that as the

7   offense level numbers get higher toward the bottom of the

8   table, so do the sentences in the table get longer.

9             And that reflects the idea that the higher the

10  offense level number, the more serious the crime, the longer

11  the sentence.

12            Across the top of the table in the Roman numerals are

13  the six criminal history categories which are based upon a

14  person's previous criminal history.  The more criminal history

15  you have in your past, the higher your Criminal History

16  Category number will be.  And, again, as these numbers get

17  higher towards the right side of the table, so do the sentences

18  in the table get longer reflecting the idea that a person with

19  a greater amount of prior criminal history should receive a

20  longer sentence.

21            At the time of sentencing, the U.S. Probation Office

22  will interview a defendant and prepare a presentence report

23  which is given to the prosecutor and the defense attorney.

24  They each have the opportunity to object.

25            The sentencing judge will then consider the

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1   presentence report and the sentencing guidelines and decide

2   what offense level applies and which Criminal History Category

3   applies.   Once these two parts of the table are known, you can

4   move over from the appropriate column on the left and drop down

5   from the appropriate column at the top where.   Where they meet

6   in the table is a period of months separated by a hyphen and

7   that period of months is called the guideline sentencing range.

8   And that range the Court must consider in deciding what

9   sentence to impose.

10          The reason we have the sentencing guidelines is that

11   the legal term is "unwarranted sentencing disparities" and that

12   boils down to the simple concept that similarly situated people

13   should receive similar sentences unless there's a good reason

14   for them to receive a different sentence and that it shouldn't

15   matter whether somebody is being sentenced by a judge sitting

16   in Phoenix as opposed to Cleveland with respect to the sentence

17   a person receives.

18          So the guidelines provide for every judge to start

19   out the same place and that is what that process with the

20   guidelines provides for, every judge to start out at the same

21   place.

22          Now, in addition to the guidelines, which are not

23   mandatory, the Court only must consider them, there are other

24   factors that the Court must also consider.

25          THE DEFENDANT:   Okay.

United States District Court

36

CR-15-00924-PHX-GMS-2, September 20, 2016

1          THE COURT:  And these are the nature and

2    circumstances of the offense, the history and characteristics

3    of the defendant, the seriousness of the offense, promote

4    respect for the law, afford just punishment, adequate

5    deterrence, protection of the public and to provide the

6    defendant with needed training and medical care.  The

7    sentencing decision must reflect consideration of all of those

8    factors.

9          THE DEFENDANT:  Okay.  I see.

10         THE COURT:  Do you understand how sentencing works

11   generally in federal court?

12         THE DEFENDANT:  Yes, I do.  Yes, I do now.

13         THE COURT:  The plea agreement has a section entitled

14   Agreements Regarding Sentencing.  And the agreement that is set

15   forth at first is one that is pursuant to a rule of the Court,

16   which means if Judge Snow accepts the plea agreement, he would

17   also have to accept and follow this agreement set forth in

18   paragraph 3(b) and it provides for you to receive a sentence of

19   five years.  And that you further agree that the Court should

20   have complete discretion to depart from any otherwise

21   applicable sentencing guideline range in order to sentence you

22   to any term of imprisonment that the Court elects to impose

23   within the above-described range.

24         And I must say that's a little bit ambiguous to me

25   and maybe we can clear that up by you telling me what it means.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    It looked to me like the 11(c)(1)(C) plea agreement was for a

2    sentence of five years and that there's not a range.  Can

3    somebody help me out with this?

4              MS. JENNIS:  Well, under 924(c) you can get five

5    years to life so I'm not sure what the --

6              THE COURT:  But this says, "Shall receive a sentence

7    of five years," and it says 11(c)(1)(C).  So Judge Snow doesn't

8    have the opportunity to impose a sentence of five years and one

9    day under the plain meaning of that sentence unless I'm missing

10   something.  What am I missing?

11             MS. JENNIS:  No.  He has to -- the defendant would

12   have to receive a sentence of five years.  I am just saying

13   that sometimes the judge would have to depart to get to five

14   years.  He doesn't because there's no applicable guideline.

15             THE COURT:  Okay.

16             MS. JENNIS:  But that is what it's supposed to mean,

17   that if there was some reason that he should have gotten more

18   than five years, the judge could depart down to the five years.

19   But clearly under this plea agreement, he can not get more than

20   five years.

21             THE COURT:  How about if the plea agreement said, "In

22   order to sentence the defendant to the term of imprisonment set

23   forth in this paragraph" instead of the language there?  I just

24   wonder -- I mean, it's your plea agreement.  You can decide

25   what you want to do.  But it might be clearer to Judge Snow and

                    United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1   save time upstairs, but I'll let you decide whether you want to

 2   leave it as it is.  You've cleared it up for me in my head what

 3   it means but, again, by saying to impose within the

 4   above-described range where there is no range under I think

 5   what Webster would say a range is.

 6           MS. JENNIS:  I've used this language before in 924(c)

 7   type pleas and I haven't had a problem.

 8           THE COURT:  Okay.

 9           MS. JENNIS:  But I just put it in there as an

10   abundance of caution.

11           THE COURT:  Okay.  Fair enough.  So this

12   discussion -- oh, go ahead.

13           MR. ROGERS:  I'm sorry.

14           THE COURT:  No.  You can talk as much as you want,

15   the two of you together.

16           MR. ROGERS:  I was just saying to him that when I

17   read it, that's the understanding that I had as Ms. Jennis has.

18           THE COURT:  Okay.  All right.

19           So what we've done is answered my question,

20   Mr. Deatherage, that what it means is under the terms of the

21   plea agreement, if Judge Snow accepts it, he must sentence you

22   to five years.  You can't argue for anythings less.  The

23   Government can't argue for anything more.

24           Do you understand that?

25           THE DEFENDANT:  I do, Your Honor.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    THE COURT:  And, in fact, even if there were no

2  arguments, Judge Snow couldn't elect under this plea agreement

3  on his own accord to sentence you to any more or any less if he

4  accepts the plea agreement.

5         Do you understand that?

6         THE DEFENDANT:  Yes, I do, Your Honor.

7         THE COURT:  And let me ask counsel whether they agree

8  with my recapitulation of the intent of the plea agreement.

9         MS. JENNIS:  I agree, Your Honor.

10        MR. ROGERS:  I do agree.

11        THE COURT:  Okay.  All right.  Thank you.

12        The plea agreement also addresses in subparagraph

13 3(c) the forfeiture provisions of the firearms and it states

14 that you agree that you are forfeiting your ownership interest

15 in the items listed in Section 8 below and that any forfeiture

16 provision contained in this plea agreement will not prevent the

17 return of seized property to anyone or entity with a legitimate

18 ownership interest.

19        Do you understand that?

20        THE DEFENDANT:  I do, Your Honor.  We discussed about

21 the phone thing.

22        MR. ROGERS:  That's a separate issue.

23        THE DEFENDANT:  Okay.

24        Yeah.  We're all good.

25        THE COURT:  Do you have any questions about anything

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1    I said regarding sentencing?

2              THE DEFENDANT:  No.  No, Your Honor.

3              THE COURT:  Do you understand everything that we

4    talked about?

5              THE DEFENDANT:  I do.

6              THE COURT:  Okay.

7              Now, we already talked about your rights at a trial

8    and you told me that you wanted to give up your right to a

9    trial.  But the plea agreement also addresses your right to

10   appeal.  Normally, a person has the right to appeal any

11   conviction, sentence or decision of the trial Court that the

12   person thinks is wrong and that appeal is to a higher court.

13   It's a different court, it's the Ninth Circuit Court of Appeals

14   based in San Francisco or perhaps even the U.S. Supreme Court

15   in Washington, DC.  And if you couldn't afford the cost of the

16   appeal or to pay for a lawyer, both of those would be provided

17   to you at no expense.

18             But if you decide to plead guilty under the terms of

19   your plea agreement, you will be giving up all of those appeal

20   rights because the plea agreement includes a very broad waiver.

21   It's in paragraph six, which starts in the bottom of page four.

22   And it states that you waive any and all motions, defenses,

23   probable cause determinations and objections that you could

24   assert to the indictment or information and any right to file

25   an appeal, any collateral attack, and any other writ or motion

CR-15-00924-PHX-GMS-2, September 20, 2016

1   that challenges the conviction, an order of restitution or

2   forfeiture, the entry of judgment against the defendant, or any

3   aspect of the defendant's sentence, including the manner in

4   which the sentence is determined including, but not limited to,

5   any appeals under Title 18 of the United States Code, Section

6   3742 for sentencing appeals and motions under 28 United States

7   Code, Sections 2241 and 2255 for habeas petitions, and any

8   right to file a motion for modification of sentence, including

9   under Title 18 of the United States Code, Section 3582(c).

10          Do you understand all of these appeal rights that you

11  would be giving up under the terms of your plea agreement?

12          THE DEFENDANT:  Yes, I do, Your Honor.

13          THE COURT:  Is it your wish to give up all of those

14  appeal rights?

15          THE DEFENDANT:  Yes.

16          THE COURT:  I cannot remember, Mr. Rogers, whether I

17  asked you whether there was any reason you were aware of that

18  your client should not be permitted to plead guilty.  Did I

19  already ask you that question?

20          MR. ROGERS:  You did, Your Honor, and I believe there

21  is none that I'm aware of.

22          THE COURT:  Okay.  I apologize for having not

23  remembered.  I would rather make sure that I ask twice than not

24  ask at all.

25          There can be other adverse consequences which can

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1   flow from a decision to plead guilty beyond the conviction and

2   sentence in your case.  Some of them are mentioned in the plea

3   agreement.  The forfeiture provisions.

4           Did you understand those forfeiture provisions?

5           THE DEFENDANT:  Yes, I do, Your Honor.

6           THE COURT:  Also, this is a felony conviction.  It

7   will result in the loss of certain civil rights such as the

8   right to vote, the right to bear arms, the right to serve on a

9   jury.  These are examples designed to make sure that you do

10  understand the possibility of other adverse consequences.

11          Do you understand that?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Have you understood everything that we've

14  talked about?

15          THE DEFENDANT:  I have.

16          THE COURT:  Now is the time that I promised you

17  before that I would say are there still things that you feel

18  that you don't know the answers to about the plea agreement or

19  about your decision to plead guilty, things that you want to

20  talk with your lawyer further about or questions you want to

21  ask your lawyer or things that you want to ask me?

22          THE DEFENDANT:  No.  I think it's pretty, pretty

23  straight and clear.

24          THE COURT:  Okay.  So the process today has cleared

25  up any haziness that you had that we talked about earlier at

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

1  the start?

2          THE DEFENDANT:  Absolutely.

3          THE COURT:  Okay.  All right.

4          Are you ready for me to ask you how you wish to

5  plead?

6          THE DEFENDANT:  Yes.

7          THE COURT:  How do you plead to the charge in the

8  information which alleges that you have violated Title 18 of

9  the United States Code, Sections -- Section 924(c)(1)(A)(i),

10  the Class A felony offense of possession of a firearm in

11  furtherance of a drug-trafficking offense, guilty or not

12  guilty?

13          THE DEFENDANT:  Guilty, Your Honor.

14          THE COURT:  The Court finds that Mr. Deatherage

15  knowingly, intelligently, and voluntarily enters a plea of

16  guilty, that there's a factual basis for this plea and that

17  you're competent to enter it.  I will sign a recommendation to

18  Judge Snow recommending that he accept your guilty plea.

19          You're sentencing date has been set for Monday,

20  December 12, 2016, at 2 p.m. before Judge Snow upstairs in

21  courtroom 602.

22          Thank you, Mr. Deatherage, and good luck to you.

23          THE DEFENDANT:  Thank you.  Thank you, Your Honor.

24          MS. JENNIS:  I'm sorry, Your Honor.  Thank you very

25  much for spending all of this time.

United States District Court

CR-15-00924-PHX-GMS-2, September 20, 2016

 1             There's just one thing that bothered me a little bit

 2      about the defendant receiving death threats.  I just don't have

 3      any information.  If that's something he would like to

 4      communicate to his counsel, that is fine.  We can discuss it.

 5      But the United States Attorney's Office has no information

 6      regarding that and so if that is happening, I just -- I would

 7      like to be informed so I could see what I could do to mitigate

 8      any of that.

 9             THE COURT:  Did you understand what the prosecutor

10      just said?

11             THE DEFENDANT:  No.  I didn't really hear.  I'm

12      sorry, Your Honor.

13             THE COURT:  Okay.  All right.  I'll ask her to say it

14      again because it's important for you to hear it.

15             Go ahead, Ms. Jennis.

16             MS. JENNIS:  I have never heard that there were death

17      threats against you, and, sir, you mentioned that every day you

18      were getting death threats.  And that is -- if that is

19      something that happening, if you could communicate that to the

20      marshals, to your lawyer, who could then contact me, I would

21      appreciate that.

22             THE DEFENDANT:  They are not going to contact you.

23             MS. JENNIS:  All right.

24             THE DEFENDANT:  They have even been to my home, Your

25      Honor, so they -- El Chapo himself, he sends people to my home.

                    United States District Court

45

CR-15-00924-PHX-GMS-2, September 20, 2016

1   It goes pretty deep.

2           THE COURT:  Okay.  The prosecutor has let you know

3   that she is interested in knowing about any death threats

4   presumably because she wants to take care to the extent that

5   she can.  She can't control the world, like I said earlier

6   about all us.  There are certain things that we can't control

7   but there are steps that people can take.

8           And so she said at the start that she had not heard

9   about this and it was news to her today and it was of concern

10  to her.  And so she wants you to know that if you would like

11  her to do what she can, if anything, that you communicate that

12  either to the U.S. Marshals or to your lawyer so that that can

13  be communicated to the prosecutor.

14          THE DEFENDANT:  Well, I think they pretty much solved

15  the problem.  They just keep me in a cell and don't let me out.

16  So I think that's about the only thing I could do.

17          THE COURT:  Okay.  But you know what she said?

18          THE DEFENDANT:  Yes.  Yes.  I do.

19          THE COURT:  Okay.  All right.  Thank you, sir.

20          THE DEFENDANT:  Thank you.  I appreciate it.

21          THE COURT:  You're welcome.

22

23

24

25

CR-15-00924-PHX-GMS-2, September 20, 2016

1

2

3

4                     C E R T I F I C A T E

5

6          I, ELAINE M. CROPPER, court-approved transcriber,

7  certify that the foregoing is a correct transcript, to the

8  best of my skill and ability, from the official electronic

9  sound recording of the proceedings in the above-entitled

10 matter.

11

12          DATED at Phoenix, Arizona, this 22nd day of May,

13 2018.

14

15

16

17                                    s/Elaine M. Cropper

18                          _____

19                                    Elaine M. Cropper

20

21

22

23

24

25

              United States District Court